Filed 12/15/21  P. v. Carpenter CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. MICHAEL WAYNE CARPENTER et al., Defendants and Appellants. | F077357 (Super. Ct. No. F14908304) **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant Michael Wayne Carpenter.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant Charda Lynn Johnson.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Eugene Alton Cozell Taylor.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Rachelle A. Newcomb, Lewis

A. Martinez, Louis M. Vasquez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On November 19, 2015, Michael Wayne Carpenter, Eugene Alton Cozell Taylor, and Char Da Lynn Johnson were charged with count 1, Medi-Cal fraud, false billing (Welf. & Inst. Code, § 14107, subd. (b)(1))[1]; count 2, Medi-Cal fraud, over billing (§ 14107, subd. (b)(2)); count 3, Medi-Cal fraud, scheme or artifice to defraud (§ 14107, subd. (b)(4)); count 4, grand theft (Pen. Code, § 487, subd. (a)); and count 5, theft of identifying information (Pen. Code, § 530.5, subd. (c)(3)).

On January 2, 2018, after a multi-week trial, a jury convicted Carpenter on counts 1 through 4, and acquitted him on count 5. It convicted Taylor on all five counts. And it convicted Johnson on count 4 and hung on the remaining counts, which were later dismissed by the Attorney General.

Carpenter was sentenced to prison for two years; Taylor to prison for two years and eight months; and Johnson to four months in custody, followed by 12 months mandatory supervised release. Carpenter and Taylor were ordered jointly and severally liable for restitution in the amount of $477,366; Johnson jointly and severally liable for $231,247.

On appeal, Carpenter contends: (1) counsel was ineffective for failing to move to suppress his statements to Medi-Cal agents under *Miranda*[2]; (2) insufficient evidence to support the elements of Medi-Cal fraud; (3) section 14107 defines only a single crime and cannot be committed in three different ways; (4) the prosecution failed to prove the elements of Medi-Cal fraud and grand theft independent of Carpenter's statements, in

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2.

violation of the corpus delicti rule; (5) the trial court erred by sentencing Carpenter to concurrent sentences for two of the Medi-Cal fraud counts and the grand theft count pursuant to Penal Code section 654; (6) the trial court committed error and violated due process when it imposed various restitution fines without making a determination of ability to pay; and (7) substantial evidence does not support the restitution order.

Taylor appeals, contending (8) the trial court erred when it denied his motion to sever his trial from that of his codefendants. Taylor joins in Carpenter's arguments (3), (5), (6), and (7).

Johnson appeals, contending (9) evidence of guilt came solely from uncorroborated testimony of co-accomplice and (10) counsel was ineffective for failing to suppress Carpenter's out of court statements implicating Johnson. Johnson joins in Carpenter's arguments (6) and (7).

We agree that section 14107 defines only a single crime and that various sentencing errors occurred as to Carpenter and Taylor. In all other respects, we affirm.

## STATEMENT OF THE FACTS

In 2009, Taylor, with the assistance of Carpenter and others, formed a nonprofit corporation, "Just 4 Kidz, Inc." (hereafter, the nonprofit). The purported purpose of the nonprofit was to provide outpatient substance abuse counseling to adolescents, primarily in school settings. Taylor submitted multiple applications to the California Health and Human Services Agency to have the nonprofit sites and clinics certified to participate in the "Drug Medi-Cal program" (DMC). After state certification, Taylor applied with the Fresno County Department of Behavioral Health for a contract to have the nonprofit service as a DMC provider in Fresno County (county), which was granted in summer 2011.

At the end of December 2012, the Bureau of Medi-Cal Fraud (hereafter Bureau), received an e-mail from Holly Rooks, a former employee of the nonprofit, stating she had observed multiple instances of Medi-Cal fraud during the three and a half months she

3.

worked for the nonprofit. Rooks provided a detailed account of the fraud committed at Scandinavian Middle School, and an investigation was opened by the Bureau.

Bureau agents interviewed Rooks, as well as other employees—Viviana Hernandez, Juan Castillo, Melissa Gonzales, and Aaron Walker. All alleged that, while working for the nonprofit, Taylor, Carpenter and Johnson directed them to commit fraud.

Bureau agents obtained billings/invoices from the nonprofit and corresponding payments from the county for August 2012 through August 2013 and traced the county checks/warrants to a specific Wells Fargo Bank account. The nonprofit had two accounts with Wells Fargo Bank and, between August 2012 through August 2013, approximately $700,000 from county checks/warrants were deposited into one of the accounts.

Bureau agents also found accounts for Johnson at Wells Fargo Bank, but no accounts for Taylor and Carpenter.[3] Records for Johnson's account showed cash deposits totaling $10,414.67 between August 14, 2012 and May 15, 2013. Johnson did receive regular payroll checks from the nonprofit, but the source of the cash could not accurately be determined from the deposits.

A search warrant was obtained, and a search executed at the home office of the nonprofit, wherein client files, billing records, employee file sign-in sheets, progress notes and bank records were seized. Bureau agents interviewed Carpenter, Johnson and Taylor.[4] Taylor denied directing anyone at the nonprofit to falsify billings or supporting records. Carpenter, after being shown incriminating evidence, acknowledged knowing about the fraud, but mitigated his responsibility by faulting himself for not exercising

---

[3] The Bureau later obtained records for accounts belonging to Ivy Roberts, Taylor's grandmother, who was listed as the initial chief executive officer on the nonprofit incorporation papers. According to Taylor, Roberts provided financial assistance to the nonprofit after it received its certification and on occasion thereafter to meet operating costs.

[4] It appears that the recording of the interview with Taylor was accidentally deleted by the agent who conducted the interview.

4.

greater oversight of the employees. Carpenter placed the blame primarily on employees Gonzales, Castillo and Hernandez. Johnson denied involvement in, or knowledge of, the fraudulent billings.

Bureau agents then interviewed 52 adolescents that the nonprofit had billed the county for substance abuse counseling services. Bureau agents also interviewed current nonprofit employee Jocelyn Brownell and did follow-up interviews with the former employees and Johnson.

Former employee Castillo described the nonprofit as "a numbers game." Identifying information for the adolescents, including Social Security numbers, would be obtained in a variety of ways. One way was by accessing the student files at the middle school. Castillo obtained this information through Boys and Girls Club files or by asking the individuals. Taylor obtained the information from a little league baseball team in exchange for buying the team's uniforms. He also obtained the information from a minor who lived in his neighborhood. Two high school students testified that they went to the nonprofit office when told they would earn some extra money with car washes to fund field trips and filled out paperwork with identifying information.

These social security numbers would then be entered into a county system to ascertain Medi-Cal eligibility. Identifying information on Medi-Cal eligible individuals was then used to bill the county for DMC services that never occurred or exceeded what was billed for. Castillo testified that Taylor "pretty much obligated and threatened" him to get the "numbers to go up," "this amount of kids in this class," "this amount of kids at this school site." Employee Jocelyn Brownell testified that Taylor instructed her to "increase the numbers."

As testified to by Castillo, Taylor instructed him to enroll Medi-Cal eligible individuals even if they did not have a substance abuse problem and not to enroll students who were ineligible for Medi-Cal, even if they needed drug counseling. Gonzales testified that the nonprofit did not enroll or bill for youths who were not Medi-Cal

eligible. And employee Holly Rooks testified that Medi-Cal eligible students were the "primary billing source" for the nonprofit, and that the nonprofit could, but did not provide drug counseling services to students not eligible for Medi-Cal.

Claims under the DMC program were billed to the county through the Substance Abuse Information System (SAIS). SAIS allowed Medi-Cal providers to input information required for billing, including type and units of service provided, as well as personal information and Social Security numbers, and SAIS would then automatically calculate the reimbursement amount. The DMC provider would then fax or e-mail the county a one-page invoice, along with two certifications—one attesting that the client for whom the services were provided was Medi-Cal eligible and the other that the billed services were medically indicated and necessary.

Between August 2012 through June 2013, the nonprofit billed the county for, and the county approved, approximately $734,386.04 in DMC reimbursements. Minus a 10 percent administrative fee, the nonprofit received roughly $660,000 during this period.

Documentation to support the claims at the time the billing information was entered into SAIS was not required. Instead, the county periodically conducted audits of the contracted DMC providers' files and records. In anticipation of these audits, the nonprofit's employees would be directed to conduct internal audits, which would entail printing out the claims billed and compare them to progress notes for services billed. If the corresponding document was missing, a nonprofit employee would prepare such a document, whether or not services had been rendered. Signatures would be signed or forged. Completing these documents required the assistance of all the nonprofit employees.

Evidence presented suggest that Taylor sought out and developed the business model for the nonprofit to receive the government funding as the revenue source. It was Taylor who completed and signed the nonprofit's articles of incorporation and statement of information; he listed himself as the agent for service of process. Taylor also

6.

completed and signed the application to the California Health and Human Services Agency to have the nonprofit sites/clinics certified to participate in the DMC program and listed himself as the clinical and executive director.

Nonprofit employees testified that Taylor personally obtained or directed others to obtain personal identifying information to determine Medi-Cal eligibility. Taylor then directed others to enroll these Medi-Cal eligible individuals into the nonprofit program even when those individuals did not have a substance abuse problem. Taylor also directed or threatened employees to fraudulently increase the amount billed by finding more individuals to enroll and/or bill for additional services—and to complete false documentation to support the billings. At times, Taylor gave bonuses to employees who found and enrolled additional Medi-Cal eligible individuals, worked on internal audits, and completed progress notes.

With the exception of Gonzales, who testified that she was a certified drug and alcohol counselor, none of the other nonprofit employees had prior experience or training as substance abuse counselors. No employee training was provided by the nonprofit, other than how to complete the paperwork.

Taylor hired Gonzales, who had experience completing Medi-Cal Drug program documentation, as well as Castillo, to conduct an internal audit. Taylor then asked the two to stay on to "get the program in order." Gonzales and Castillo then expanded the breadth of the nonprofit by an increase in the "recruitment" of Medi-Cal eligible individuals and fraudulent billings.

Carpenter provided financial and operational assistance to Taylor, as the director of operations, and gave Taylor advice on how to run a corporate organization. Carpenter admitted to a Bureau agent that the nonprofit was engaged in fraud, stating the nonprofit "bill[ed] for sessions that, that kids don't show up to." According to employees, Carpenter was present at staff meetings where Taylor directed employees to engage in fraudulent activity or scolded employees for not engaging in fraudulent activities.

Johnson was promoted to site coordinator at both Boys and Girls Club sites and then to program director for the nonprofit when Gonzales left. According to Taylor, the program director for the nonprofit was responsible for monitoring programs, developing and training staff and entering data into SAIS. Various employees testified that Johnson knew the nonprofit was engaged in fraud and directed employees to commit fraudulent acts.

## DISCUSSION

### CARPENTER

1. *Did Carpenter receive ineffective assistance of counsel?*

Carpenter contends trial counsel was ineffective for failing to suppress his statement to bureau agents, who failed to advise him of his *Miranda* rights prior to interviewing him. We disagree.

#### Background

Ten agents from the bureau, including Agents Donny Fong and Katie Phelan, arrived at the nonprofit office at 9:10 a.m. on October 15, 2013, to execute a search warrant for the seizure of billing records, bank records, and client and personnel files. Agent Fong telephoned Taylor, who said he was coming. While officers searched the nonprofit office and waited for Taylor, the agents interviewed Carpenter beginning around 10:30 a.m. Agent Fong asked Carpenter if he had "time to talk," to which Carpenter answered, "yeah." Carpenter agreed to talk in one of the rooms of the office suite.

Agent Fong asked Agent Phelan to assist in the interview. The two sat next to each other, across from Carpenter. The door to the room was closed. Carpenter and Agent Fong sat next to the door; Agent Phelan was farthest from the door. Before questioning began, Agent Fong informed Carpenter that he was not under arrest, was "not even being detained," and he could "leave anytime." Agent Fong told him "The door's

8.

closed, but you can walk out anytime, you don't have to talk to us, okay? We just want to tell you what we're doing here."

When Agent Fong asked Carpenter if he wanted to talk to them, he said, "Yeah, yeah." The encounter lasted about one hour and 20 minutes, and was recorded, unbeknownst to Carpenter, as the recorder was underneath a notepad.

During the interview, after being told the agents had already interviewed students and employees and confronted with information that the nonprofit was "billing for students that don't come for sessions," Carpenter mitigated his responsibility for any possible fraud by faulting himself for not exercising greater oversight of the employees and placed the blame primarily on employees Gonzales, Castillo and Hernandez.

*Applicable Law and Analysis*

Carpenter argues that trial counsel was ineffective for not moving to suppress his statements to Agents Fong and Phelan because the agents did not advise him of his *Miranda* rights prior to his interview. We find no violation of *Miranda,* and therefore no ineffective assistance of counsel.

In assessing a claim of ineffective assistance of counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Gray* (2005) 37 Cal.4th 168, 206–207.) The defendant "bears the burden of establishing constitutionally inadequate assistance of counsel." (*People v. Gray*, *supra,* at p. 207.)

"The Fifth Amendment provides that '[n]o person ... shall be compelled in any criminal case to be a witness against himself.' [Citations.] To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation [citation], the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation

9.

[citation].... [¶] A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 338–339; accord, *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217 [" '*Miranda* makes clear that in order for defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel.' "].) "Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374; accord, *People v. Jackson, supra,* at p. 339.)

"California courts have limited [*Miranda*'s] requirements ... to 'law enforcement officials,' their agents, and agents of the court, while the suspect is in official custody." (*In re Deborah C.* (1981) 30 Cal.3d 125, 130, 134, [private store detective was not required to give *Miranda* warning before questioning juvenile after citizen's arrest for shoplifting]; accord, *People v. Thornton* (2007) 41 Cal.4th 391, 432 ["Interrogation thus refers to questioning initiated by the police or its functional equivalent ...."]; see *Estelle v. Smith* (1981) 451 U.S. 454, 467 [psychiatrist performing court-ordered pretrial psychiatric examination of defendant in custody was required to provide *Miranda* warning as an "agent of the State"].)

In addition, an officer's obligation to administer a *Miranda* warning arises only when a person is " 'in custody.' " (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) " 'Absent "custodial interrogation," *Miranda* simply does not come into play.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) For purposes of *Miranda,* a person is in custody when there is " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " (*Thompson v. Keohane* (1995) 516 U.S. 99, 112; *People v. Ochoa, supra,* at p. 401.) But an individual is not in custody if, under the circumstances, " 'a reasonable person in [his] position would have felt free to end the questioning and leave.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) "Custody

10.

determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, fn. omitted.)

Courts have identified a variety of circumstances to be considered as part of the custody determination. Among them are

> "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation. [Citations.] [¶] No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

Here, Agent Fong approached Carpenter and asked if he had "time to talk," to which Carpenter answered in the affirmative. The two agreed to talk in one of the rooms in the office suite. Agent Phelan then joined. Carpenter was told by Agent Fong that he was not under arrest, "not even being detained," and that he could leave any time. While the door to the room was closed, Carpenter was told he could "walk out anytime, you don't have to talk to us." When asked if he wanted to talk, Carpenter said, "Yeah, yeah." The interview took a bit less than an hour and a half. Near the 52-minute mark, it appears that Agent Fong became frustrated with Carpenter and stated, "Okay, okay, end of

11.

interview." Carpenter, however, then repeatedly insisted he was not lying. Agent Fong replied, stating, "Alright, thank you very much for your time … like I said you were always free to leave, uh you know, we're doing a search warrant right here so."

Even assuming Agents Fong and Phelan were law enforcement officials or agents of the court, nothing about the interview points to Carpenter being "in custody." Agent Fong first asked Carpenter if he had time to talk, to which Carpenter voluntarily agreed. (Cf. *United States v. Rainbow* (N.D. 2005) 380 F.Supp.2d 1071, 1076 [Rainbow voluntarily acquiesced to questioning by FBI agents, an "indicia [that] weighs in favor of a finding that Rainbow was not in custody during the interview"].) The entire interview took place in a room at Carpenter's workplace. (Cf. *United States v. Wallace* (8th Cir. 2003) 323 F.3d 1109, 1113 ["The entire event occurred at Wallace's workplace, a location familiar to Wallace and a place where she would be comfortable and less threatened"].)

Before the interview started, Carpenter was told he was not under arrest or being detained, that he did not have to talk to the agents, and he could leave at any time. He was not physically restrained. (See *United States v. Griffin* (8th Cir. 1990) 922 F.2d 1343, 1349 ["The most obvious and effective means of demonstrating that a suspect has not been 'taken into custody or otherwise deprived of freedom of action,' is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. Where a suspect has been so advised, custody has frequently been found not to exist"]; see also *United States v. Brown* (11th Cir. 2006) 441 F.3d 1330, 1347 ["Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraint that are " 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.' "].)

And while the agents confronted Carpenter with evidence against him, accused him of lying, and expressed disbelief at some of Carpenter's responses, the interview

remained conversational. (Cf. *United States v. Laurita* (8th Cir. 2016) 821 F.3d 1020, 1026 ["We have consistently concluded that methods which more closely resemble 'strong arm tactics' than those alleged in this case, such as accusing a suspect of lying or officers' use of a raised voice, have little bearing on whether a suspect would have felt free to terminate an interview"].)

A reasonable person in Carpenter's position would certainly have felt he could leave, and he was therefore not in custody for purposes of *Miranda* warnings. As such, a motion to suppress Carpenter's statements to Agents Fong and Phelan on *Miranda* grounds would have been futile. "Counsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) We therefore reject Carpenter's claim of ineffective assistance of counsel.

## 2. *Is there sufficient evidence of Medi-Cal fraud?*

Carpenter next contends there was insufficient evidence to support his convictions for Medi-Cal fraud under section 14107, subdivision (b)(1), (b)(2), and (b)(4). We disagree.

### *Standard of Review*

To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains " 'evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 104.) The standard of review is the same when the prosecution relies mainly on circumstantial evidence. (*Ibid.*)

### *Applicable Law and Analysis*

Section 14107, subdivision (a) provides, in relevant part, that any person who engages in any of the activities identified in subdivision (b) is punishable by imprisonment or fine. Subdivision (b) provides, as relevant here, that the following activities are subject to subdivision (a):

13.

"(1) A person, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise under this chapter ….

"(2) A person knowingly submits false information for the purpose of obtaining greater compensation than that to which he or she is legally entitled for furnishing services or merchandise under this chapter ….  [¶] … [¶]

"(4) A person knowingly and willfully executes, or attempts to execute, a scheme or artifice to do either of the following: [¶] (A) Defraud the Medi-Cal program or any other health care program administered by the department or its agents or contractors. [¶] (B) Obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, the Medi-Cal program or any other health care program administered by the department or its agents or contractors, in connection with the delivery of or payment for health care benefits, services, goods, supplies, or merchandise." (§ 14107, subd. (b)(1)–(4).)

Carpenter's argument is that, while the jury heard lengthy testimony from numerous witnesses detailing a pattern of fraud dictated by Taylor, there was no testimony that Carpenter committed or directed any fraud.  Carpenter acknowledges that he stated during interrogation that he was aware of others committing fraud, but argues his convictions were based only on the fact that he picked up checks from the county and the crimes at issue were completed long before any action on Carpenter's part.

The prosecutor argued Carpenter was liable as an aider and abettor.  A person aids and abets the commission of a crime when he or she, "acting with (1) knowledge of the unlawful purpose of the perpetrator[;] and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense[;] (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  Instructions on aiding and abetting were given.

We find ample evidence to support Carpenter's conviction of Medi-Cal fraud.  According to Carpenter's own admission, he knew that the nonprofit was billing for sessions that "kids don't show up to."  And when asked by Agent Fong, "So you pretty

14.

much, you knew what was going on [before an internal audit], you knew that you guys were billing for services not provided, fraud." Carpenter replied, "Yes."

Rooks testified that Carpenter was present at the staff meeting where Taylor directed employees Rooks, Hernandez and Castillo to access student files at Scandinavian Middle School and find 70 Medi-Cal eligible students. Gonzales testified that Carpenter was present at a meeting where Taylor was upset with Gonzales, Castillo and Hernandez for discharging students who were not attending counseling sessions and directing them to "continue to bill for services and that anything needed to be ran through him first." Brownell testified that Carpenter was present at an all-staff meeting regarding an internal audit, where Taylor instructed staff on what to do. Rooks testified that Carpenter was present at staff meetings and "worked closely" with Taylor. Hernandez echoed Rooks' observations. Walker described Taylor as being "owner and in charge," and Carpenter as "second in command." And Castillo recalled a staff meeting in which Carpenter did most of the talking, specifically about Castillo not making enough money for the company, stating he could "walk out that door and never come back" if he was not going to listen to him.

We reject Carpenter's claim of insufficiency of the evidence.[5]

3. *Does section 14107 define only a single crime?*

Carpenter contends his three convictions under section 14107 (counts 1, 2, and 3) are improper, as the statute describes a single offense, Medi-Cal fraud. Thus, he argues, he can only be convicted once for that violation. Taylor, who was similarly convicted, joins in the argument.[6] The People concede the issue, and we agree.

---

[5]     While we find sufficient evidence of Medi-Cal fraud, we explain and find in part 3., below, that two of the three Medi-Cal fraud convictions for both Carpenter and Taylor must be dismissed.

[6]     Taylor words his argument slightly differently, arguing that only his conviction on count 3 should be reversed because the offense expressed in section 14107, subdivision

*Applicable Law and Analysis*

Penal Code section 954 provides, in pertinent part, that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense ... under separate counts .... The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged ...." "Thus multiple charges and multiple convictions can be based on a single criminal act, if the charges allege separate offenses." (*People v. Muhammad* (2007) 157 Cal.App.4th 484, 490; see *People v. Ryan* (2006) 138 Cal.App.4th 360, 368.) However, Penal Code section 954 " 'does not permit multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct.' " (*People v. Vidana* (2016) 1 Cal.5th 632, 650 (*Vidana*).) That is, Penal Code section 954 prohibits multiple convictions for the same offense based on alternate legal theories. (*Vidana, supra,* at p. 650.) " 'If only a single act is charged as the basis for multiple convictions, only one conviction can be affirmed, notwithstanding that the offenses are not necessarily included offenses....' " (*People v. Beamon* (1973) 8 Cal.3d 625, 637.) We review, de novo, the issue of whether multiple convictions are proper under Penal Code section 954. (*People v. Villegas* (2012) 205 Cal.App.4th 642, 646.)

Carpenter and Taylor were both charged with three counts of Medi-Cal fraud. To determine whether Carpenter and Taylor were properly convicted on two of the three counts, we must determine whether subdivision (b)(1), (b)(2), and (b)(4) of section 14107 define " 'different offenses or merely describe different ways of committing the same offense.' "[7] (*Vidana, supra,* 1 Cal.5th at p. 637.) The resolution of this question

(b)(4) is necessarily included within the offenses expressed in subdivision (b)(1) and (b)(2) (counts 1 and 2).

[7] Carpenter incorrectly refers to these three counts as convictions under section 14107, subdivision (b)(1), (b)(2), and (b)(3).

16.

" 'properly turns on the Legislature's intent,' and 'if the Legislature meant to define only one offense, we may not turn it into two.' " (*Ibid.*) We focus on the statutory language, giving the words " ' "a plain and commonsense meaning" ' " and construing them " ' " ' "in context, keeping in mind the nature and obvious purpose of the statute ...." ' " ' " (*People v. Gonzalez* (2014) 60 Cal.4th 533, 537 (*Gonzalez*).)  We also consider the structure of the statute, including whether the subdivisions are drafted to be self-contained or contain separate elements and punishments.  (*Id.* at p. 539.)

In its current form, section 14107 provides, in part:

"(a) Any person, including any applicant or provider as defined in Section 14043.1, or billing agent, as defined in Section 14040.1,who engages in any of the activities identified in subdivision (b) is punishable by imprisonment as set forth in subdivisions (c), (d), and (e), by a fine not exceeding three times the amount of the fraud or improper reimbursement or value of the scheme or artifice, or by both this fine and imprisonment.

"(b) The following activities are subject to subdivision (a):

"(1) A person, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise under this chapter or Chapter 8 (commencing with Section 14200).

"(2) A person knowingly submits false information for the purpose of obtaining greater compensation than that to which he or she is legally entitled for furnishing services or merchandise under this chapter or Chapter 8 (commencing with Section 14200).

"(3) A person knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise under this chapter or Chapter 8 (commencing with Section 14200).

"(4) A person knowingly and willfully executes, or attempts to execute, a scheme or artifice to do either of the following:

"(A) Defraud the Medi-Cal program or any other health care program administered by the department or its agents or contractors.

"(B) Obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, the Medi-Cal program or any other health care program administered by the department or its agents or contractors, in connection with the delivery of or payment for health care benefits, services, goods, supplies, or merchandise.

"(c) A violation of subdivision (a) is punishable by imprisonment in a county jail, or in the state prison for two, three, or five years.

"(d) If the execution of a scheme or artifice to defraud as defined in paragraph (4) of subdivision (b) is committed under circumstances likely to cause or that do cause two or more persons great bodily injury, as defined in Section 12022.7 of the Penal Code, or serious bodily injury, as defined in paragraph (4) of subdivision (f) of Section 243 of the Penal Code, a term of four years, in addition and consecutive to the term of imprisonment imposed in subdivision (c), shall be imposed for each person who suffers great bodily injury or serious bodily injury. [¶ ] "The additional terms provided in this subdivision shall not be imposed unless the facts showing the circumstances that were likely to cause or that did cause great bodily injury or serious bodily injury to two or more persons are charged in the accusatory pleading and admitted or found to be true by the trier of fact.

"(e) If the execution of a scheme or artifice to defraud, as defined in paragraph (4) of subdivision (b) results in a death which constitutes a second degree murder, as defined in Section 189 of the Penal Code, the offense shall be punishable, upon conviction, pursuant to subdivision (a) of Section 190 of the Penal Code. [¶] … [¶]"

While no recent case has addressed the issue, the court in *People v. Hathaway* (1972) 27 Cal.App.3d 586 (*Hathaway*), addressed the issue of whether a prior version of section 14107 described three different crimes or one crime that can be committed three different ways.  The prior version read:

"Any person who, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise, knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise, or knowingly submits false information for the purpose of obtaining authorization for furnishing services or

18.

merchandise … is punishable by imprisonment [], or by fine not exceeding five thousand dollars ($5,000), or both such fine and imprisonment.

"The enforcement remedies provided under this section are not exclusive and shall not preclude the use of any other criminal or civil remedy." (*Hathaway, supra,* at p. 592, fn. 5.)

In *Hathaway*, the defendant claimed that a number of his charged counts were duplicitous in that section 14107 defined three different crimes, two of which—presenting a false claim and submitting false information to obtain greater compensation—were charged in each of the challenged counts. The court in *Hathaway* disagreed, stating:

"The question whether a criminal statute is intended to create one or more offenses has been before the courts a number of times. An authoritative statement of the applicable principles will be found in *Bealmear v. So. Cal. Edison Co.* [(1943)] 22 Cal.2d 337, 343 … : ' "Various tests are applied in determining whether statutes are intended to create one or more offenses. The identity of intent fixed by the statute in the doing of all the prohibited acts is said to indicate a single offense. [Citation.] Whether the indictable acts may be considered as representing a stage in the commission of the same offense is also a guide to construction." [¶] Both tests referred to in *Bealmear* indicate that the even-numbered counts on the amended indictment charge but one offense." (*Hathaway, supra,* 27 Cal.App.3d at p. 593, fn. omitted.)

*Hathaway* was cited with approval by the court in *People v. Gregory* (1990) 217 Cal.App.3d 665 (*Gregory*), which held, "Although section 14107 describes three ways the statute may be violated, the statute defines a single criminal offense, not several different crimes." (*Gregory, supra,* at p. 676, fn. 5.)

In 2000, the Legislature amended section 14107 to its current form (Stats. 2000, ch. 322, § 27 [Assem. Bill No. 1098].) The prohibited activities—presentation of false or fraudulent claims for furnishing services, submission of false information for purpose of obtaining greater compensation for furnishing services, and submission of false information for purpose of obtaining authorization for furnishing services—are no longer in a single paragraph but separated into subdivisions. (§ 14107, subd. (b)(1)–(3).)

19.

Section 14107, subdivision (b)(4), was added, which prohibits the execution of, or the attempts to execute, a scheme or artifice to defraud "the Medi-Cal program or any other health care program administered by the department …."

Section 14107, as amended, does not expressly state whether subdivision (b)(1) through (4) describe different means of committing a single offense of Medi-Cal fraud or define different Medi-Cal fraud offenses. Nor is there anything in the 2000 amendment stating one way or the other.

At the time of the amendment, there was existing case law that held the three prohibited activities enumerated in the prior version of the statute were three different means of committing the single offense of Medi-Cal fraud. (*Hathaway, supra,* 27 Cal.App.3d at p. 593; accord, *Gregory, supra,* 217 Cal.App.3d at p. 676, fn. 5.) The Legislature is presumed to know about existing case law when it enacts or amends a statute. (*In re W.B.* (2012) 55 Cal.4th 30, 57, citing *People v. Overstreet* (1986) 42 Cal.3d 891, 897.) As such, had the Legislature intended subdivision (b)(4) to be a separate offense, it could have codified the execution of a scheme to defraud the Medi-Cal program as a separate and distinct offense. (See, e.g., 18 U.S.C. § 1347 [punishing knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program].)

Further suggesting that section 14107, subdivision (b)(1) through (b)(4) describe different means of committing a single offense, the prescribed punishment for subdivision (b)(1) through (b)(4) is the same and found in the same subdivision: "imprisonment in a county jail, or in the state prison for two, three, or five years" (§ 14107, subd. (c)), "by a fine not exceeding three times the amount of the fraud or improper reimbursement or value of the scheme or artifice, or by both this fine and imprisonment" (§ 14107, subd. (a)). (Compare *Gonzalez, supra,* 60 Cal.4th at p. 539 [each subdivision of Pen. Code, § 288, subd. (a), oral copulation, found to be self-

contained because subds. (b) through (k) defines various ways the act may be criminal, and each prescribes a specific punishment].)

In *Gonzalez*, the defendant was convicted of oral copulation of an unconscious person in violation of Penal Code section 288a, subdivision (f) and oral copulation of an intoxicated person in violation of Penal Code section 288a, subdivision (i) based on the same act. (*Gonzalez, supra,* 60 Cal.4th at p. 536.) In concluding that the Legislature intended these subdivisions to define separate offenses, the court primarily relied on the structure of the statute: "Subdivision (a) of [Penal Code] section 288a defines what conduct constitutes the act of oral copulation. Thereafter, subdivisions (b) through (k) define various ways the act may be criminal. Each subdivision sets forth all the elements of a crime, and each prescribes a specific punishment. Not all of these punishments are the same. That each subdivision of [Penal Code] section 288a was drafted to be self-contained supports the view that each describes an independent offense, and therefore [Penal Code] section 954 is no impediment to a defendant's conviction under more than one such subdivision for a single act." (*Id.* at p. 539.)

For reasons expressed above, we agree with respondent that the Legislature's intent was for section 14107, subdivision (b)(1) through (4) to describe different means of committing the single offense of Medi-Cal fraud. As such, we agree with respondent's concession to vacate counts 1 and 2 as to Carpenter and Taylor.

4. *Did the prosecution fail to prove the elements of Medi-Cal fraud and grand theft independent of Carpenter's statements, in violation of the corpus delicti rule?*

Carpenter next contends the prosecution failed to present sufficient evidence of Medi-Cal fraud and grand theft to satisfy the corpus delicti rule, which rule requires that, when a defendant makes extrajudicial incriminating statements, there also be independent evidence of the corpus delicti, meaning of the body of the crime itself, in order to convict. As argued by Carpenter, "despite a lengthy multi-week trial, [Carpenter's] conviction in

21.

these crimes was based solely on the most tenuous of grounds, a single statement that he told Agent Fong that he picked up checks from the county." We disagree.

*Applicable Law and Analysis*

In a criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—the fact of loss, injury or harm caused by a criminal act. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 (*Alvarez*).) The corpus delicti rule is this: the prosecution must establish the corpus delicti *independent* from the defendant's admissions, ensuring that the defendant is not falsely convicted by his own untested words alone. (*Id.* at p. 1169.) The independent proof may be circumstantial and is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also possible. (*Id.* at p. 1171.) The amount of independent proof of a crime can be slight or minimal. The prosecution need make only a prima facie showing permitting the reasonable inference that a crime was committed. Once the necessary showing of independent evidence is met, the defendant's extrajudicial statements may be considered by the jury to strengthen the case on all issues. (*People v. Jones* (1998) 17 Cal.4th 279, 301-302.)

The identity of the defendant as the perpetrator of the crime, however, is not part of the corpus delicti. Identity may be established by the defendant's words alone. (*People v. Frye* (1998) 18 Cal.4th 894, 959, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) When a defendant's statements form part of the prosecution's case, the trial court must instruct sua sponte that a finding of guilt cannot be predicated on the statements alone. (*Alvarez, supra,* 27 Cal.4th at p. 1170.) The corpus delicti rule is defined in the CALCRIM No. 359 instruction, and its predecessor, CALJIC No. 2.72. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258-1259.)

22.

Here, CALCRIM No. 359 was given as follows:

"The Defendants may not be convicted of any crime based on his or her out-of-court statements alone. You may rely on the Defendant's out-of-court statements to convict him or her only if you first conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime. If other evidence shows that the charged crime was committed, the identity of the person who committed it may be proved by the Defendant's statements alone."

There was no defense objection to the admission of Carpenter's extrajudicial statements on grounds of the corpus delicti rule at trial. There is authority for the proposition that lack of such an objection forfeits this claim on appeal. (See *People v. Martinez* (1994) 26 Cal.App.4th 1098, 1103–1104; *People v. Sally* (1993) 12 Cal.App.4th 1621, 1628.) We will, however, address the issue on the merits.

As noted above, "the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause," and "cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant"; "some independent proof of the corpus delicti" is required. (*Alvarez, supra,* 27 Cal.4th at pp. 1168–1169.) Carpenter's argument is that, in violation of the corpus delicti rule, "there was no prima facie showing at all of any involvement of [Carpenter] in any crime independent of [Carpenter's] statement." Not so.

While the corpus delicti rule requires the prosecution to show that a crime actually occurred independent of the accused's statement, the rule does not, as Carpenter seems to imply, require the prosecution to demonstrate the accused's involvement in the crime independent of his statement. "Proof of the corpus delicti does not require identity of the perpetrators. It is not necessary that it connect the defendant with the commission of the crime although it may do so." (*People v. Cullen* (1951) 37 Cal.2d 614, 624.)

23.

We agree with the People that there was sufficient evidence of the corpus delicti to convict Carpenter of Medi-Cal fraud and grand theft.

The corpus delicti of Medi-Cal fraud consists of submission of a false claim or information with the intent to defraud or knowing execution of a scheme to defraud Medi-Cal. (§ 14107, subd. (b)(1), (2) & (4).) As discussed in issue 2, above, we find ample evidence to support Carpenter's conviction of Medi-Cal fraud, independent of his own statements. The testimony of former employees, the nonprofit files and billing records, and the county checks paid to the nonprofit, establish the corpus delicti for Medi-Cal fraud.

The elements of grand theft on a theory of false pretenses, as alleged here, requires, " '(1) the defendant made a false promise or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' " (*People v. Williams* (2013) 57 Cal.4th 776, 787, italics omitted.) The corpus delicti of the crime— that property was transferred by the owner (the Medi-Cal program) in reliance on false representation—was adequately established by the evidence aside from Carpenter's statements to the agents. There was ample evidence of the county's checks paid to and deposited into the nonprofit's account to satisfy this theft conviction.

We find no violation of the corpus delicti rule and reject Carpenter's claim to the contrary.

5. *Did the trial court err by sentencing Carpenter and Taylor to concurrent sentences for two of the Medi-Cal fraud counts and the grand theft count in violation of Penal Code section 654?*

Carpenter next argues that Penal Code section 654 requires the sentences imposed on counts 1, 2, and 4 be stayed. Taylor joins in the argument, but his sentence on counts 2 and 4 were stayed pursuant to Penal Code section 654 at sentencing. We therefore address his claim only as to count 1.

24.

Both Carpenter and Taylor were sentenced to prison for the mitigated term of two years on count 3 (§ 14107, subd. (b)(4)). The court also imposed mitigated terms on count 1 (§ 14107, subd. (b)(1)), count 2 (§ 14107, subd. (b)(2)) and count 4 (Pen. Code, § 487, subd. (a)). For Carpenter, the terms on counts 1, 2, and 4 were ordered to run concurrently to the term on count 3. As noted above, for Taylor, the term for count 1 was ordered to run concurrent to count 3, but the term for counts 2 and 4 were stayed.

We agree with respondent that the term imposed on count 4 must be stayed but, as explained in issue 3, above, because we vacate counts 1 and 2, we need not address the applicability of Penal Code section 654 as to them.

Penal Code section 654[8] provides, in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision.…" (Pen. Code, § 654, subd. (a).) The purpose of Penal Code section 654 is to " 'ensure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Kelly* (2018) 28 Cal.App.5th 886, 904.) Therefore, "if all of the crimes were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)

Here, Carpenter and Taylor had a single intent and objective—to steal money from the DMC—which was accomplished through submitting false billings and claims to the county. The Medi-Cal fraud was how Carpenter and Taylor committed grand theft by false pretense.

As we addressed in issue 3, above, we vacate Carpenter's and Taylor's count 1 and 2 convictions. We now stay the term imposed on count 4 as to Carpenter. Taylor's term on count 4 was already stayed.

---

[8] As applicable January 1, 2022 (Assem. Bill No. 518).

25.

6. *Did the trial court commit error and violate due process when it imposed various restitution fines without making a determination on ability to pay?*

As part of Carpenter, Johnson and Taylor's sentence, the trial court ordered that each pay a court operating assessments fine in the amount of $40 (Pen. Code, § 1465.8) and a court facilities fine of $30 (Gov. Code, § 70373). It also ordered that Carpenter and Johnson pay a restitution fine of $600 and Taylor a restitution fine of $1,800 (Pen. Code, § 1202.4, subd. (b)). Carpenter, with Johnson and Taylor joining (together appellants), argue that the trial court violated due process rights by imposing these fines, fees, and assessments without determining whether each had the ability to pay these amounts. Appellants' argument is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after sentencing and while this current appeal was pending. We find no prejudicial error.

*Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" certain fines or fees. (*Dueñas, supra,* 30 Cal.App.5th at p. 1164; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488–489.) Relying on *Dueñas*, appellants ask this court to stay execution of the fees and fines unless and until the trial court holds an ability to pay hearing and concludes that appellants have the present ability to pay the restitution fine.

In *Dueñas*, the defendant lost her driver's license because she was financially unable to pay her juvenile citations. (*Dueñas, supra,* 30 Cal.App.5th at p. 1161.) She continued to reoffend for driving with a suspended license because the aggregating criminal conviction assessments and fines prevented her from recovering her license. (*Ibid.*) The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty." (*Id.* at pp. 1163, 1164.) The *Dueñas* court concluded the defendant faced ongoing unintended punitive consequences because of the imposed financial obligations. (*Id.* at p.

26.

1168.)  *Dueñas* determined those unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process.  (*Ibid.*)

We decline to expand *Dueñas*'s holding here beyond the unique facts found in that case.  Unlike the *Dueñas* defendant, appellants do not establish the violation of a fundamental liberty interest.  (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056.)  Appellants' incarceration was not a consequence of prior criminal assessments and fines.  Nor were they deprived of liberty because of indigency.  (See *id.* at pp. 1056–1057 [due process not violated when defendants are not denied access to the courts, not prohibited from presenting a defense, not incarcerated due to an inability to pay prior fees, fines, or assessments, do not face ongoing unintended punitive consequences, or do not suffer a violation of a fundamental liberty interest]; *People v. Son* (2020) 49 Cal.App.5th 565, 599-601 (conc. & dis. opn. of Franson, J.) [no violation of fundamental liberty interest where trial court imposed disputed fees, fines, and assessments without first conducting an ability to pay hearing; case did not present unique concerns addressed in *Dueñas*— defendant was not incarcerated because of his indigency, but for his continuing violent criminal acts while serving a life prison term]; but see *id.* at pp. 577–579 (lead opn. of Smith, J.) [nonpunitive court facilities and court operations assessments may not be imposed on a defendant who is unable to pay because these charges are imposed on court users for use of the court, burdening their exercise of the fundamental right of access to the criminal courts].)

In any event, we find any error arising from the court's failure to make an ability to pay finding harmless beyond a reasonable doubt since appellants all have the ability to pay the fine and fees imposed in this case.  (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031, 1035; *Aviles, supra,* 39 Cal.App.5th at pp. 1075–1077.)

" ' "Ability to pay does not necessarily require existing employment or cash on hand."  [Citation.]  "[I]n determining whether a defendant has the ability to pay a

27.

restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody." (*Aviles, supra,* 39 Cal.App.5th at p. 1076.)

We can infer from the instant record that appellants have the ability to pay the aggregate amount of fine and fees from probable future wages. Time in custody for the appellants was not long: Carpenter was sentenced to prison for two years; Taylor to prison for two years and eight months; and Johnson to four months in custody, followed by 12 months mandatory supervised release. All were employed prior to the current convictions. We thus conclude, based on the record before us, that appellants are able to pay the fines and fees imposed.

7. *Does substantial evidence support the restitution order?*

Carpenter and Taylor were ordered jointly and severally liable for restitution in the amount of $447,366, and Johnson jointly and severally liable in the amount of $231,247. Carpenter, again joined by Taylor and Johnson, argue a violation of due process of law because the restitution order was based on claims of loss not substantiated by the record. We disagree.

Prior to sentencing, the People filed a brief requesting appellants be jointly and severally liable in the amount of $660,421, which represented payments from the county to the nonprofit from August of 2012 through June of 2013.

At sentencing April 6, 2018, the trial court noted the People's restitution request, but stated it was considering instead a restitution amount calculated by adding the amount billed for the 10 individuals who testified at trial that they gave their personal identifying information and "received nothing in return, certainly no counseling services," plus the amount billed for Scandinavian Middle School and the two Boys and Girls Club locations. The trial court asked that the People tabulate this amount. When asked if anyone had any comments, counsel for Johnson began to object, to which the trial court

28.

then clarified that it would not hold Johnson liable for "billings that were made prior to her taking over the role as biller."

Johnson's counsel then stated that it would submit on the issue of restitution for the 10 individuals but asked that she not be responsible for the restitution in the amounts billed at Scandinavian Middle School or Boys and Girls Club. The People objected, stating that she was the biller, at least from February 2013 forward and "heavily involved" as a counselor and site coordinator prior to that and was part of "this whole scheme to defraud." The trial court disagreed and again stated that Johnson's "restitution amount begins the day she began billing," and Carpenter and Taylor were "jointly and severally liable for [the] whole total, whatever that turns out to be."

The People informed the trial court that determining the correct amount required worksheets and a computer not available at the moment. While the People agreed to the new amount, they asked that the trial court "set a date [to] provide the numbers." Due to conflicting schedules, counsel for Johnson suggested the People provide the amount in an e-mail and how the amount was arrived at, and counsel would then submit an order to the trial court. The trial court agreed and suggested that the People provide the amount by a certain date, send that information to the parties and, if all counsel agreed by e-mail, the trial court would issue an order. The trial court stated that, "[i]f there is a disagreement, then while we're here we'll set up a fallback date for [the parties] to make their argument." The parties agreed that the People provide the amount by the following Friday, April 13, 2018, and counsel for appellants would have until the Friday after that, April 20, 2018, to stipulate or disagree, and a "backup date" hearing was set for that date.

There is no indication in the record that the parties objected or a subsequent hearing on restitution was held. The restitution order, issued May 23, 2018, states that the parties were present on April 6, 2018, at which time the trial court ordered the People to calculate the amount of restitution based on all of the billings by the nonprofit for the 10 former students who testified at trial, plus all billings for Scandinavian Middle School

29.

and both Boys and Girls Clubs during the relevant period. The order found the Medi-Cal program to be the victim and Carpenter and Taylor jointly and severally liable for the total restitution amount of $447,366, and Johnson jointly and severally liable for a portion of the total in the amount of $231,247, based on the amount of billings from January 1, 2013 through June 30, 2013.

Penal Code section 1202.4, subdivision (a)(3)(B), requires the court to order a defendant to pay restitution to victims in accordance with subdivision (f) which, in turn states, in pertinent part, "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." The Medi-Cal program clearly qualifies for a restitution award in the instant case, as it is a "victim" as defined by statute. (See Pen. Code, § 1202.4, subd. (k)(2) [noting a "victim" for purposes of this statute includes a "government, governmental subdivision, agency, or instrumentality .…"].)

" '[T]he trial court is vested with broad discretion in setting the amount of restitution [and] it may " 'use any rational method of fixing the amount of restitution which is reasonably calculated to make the victim whole.' " ' " (*People v. Ortiz* (1997) 53 Cal.App.4th 791, 800.) All that is required is that the court's award have a "rational" basis (*id.* at p. 799), and the standard of proof at a restitution hearing is preponderance of the evidence. (*People v. Baker* (2005) 126 Cal.App.4th 463, 469.) "[A] prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has ... made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]' [Citation.]" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.) "There is no requirement the restitution order be limited to the exact amount of the loss in

which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.)

" 'The standard of review of a restitution order is abuse of discretion. "A victim's restitution right is to be broadly and liberally construed." [Citation.] " 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " ' " (*People v. Baker, supra,* 126 Cal.App.4th at p. 467.) Moreover, although a restitution award may be challenged on the ground no substantial evidence supports the award, "[i]n reviewing the sufficiency of the evidence, the ' "power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings.' [Citations.] ... 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact." (*Id.* at pp. 468–469.)

The trial court's restitution order was reasonable and supported by substantial evidence. The jury found there was a scheme or artifice to defraud the Medi-Cal program. The People made a prima facie showing that the amounts the nonprofit billed for and received were losses incurred by the Medi-Cal program as a result of the scheme to defraud.

In any event, we find it is too late for appellants to contend the restitution order was not supported by substantial evidence. This is not a question of law and appellants could have, but did not, challenge the factual basis for the restitution order in the trial court. (*People v. Mays* (2017) 15 Cal.App.5th 1232, 1237–1238.) Had appellants wished to argue on appeal that there was no factual basis for the restitution order, they must have objected on that ground below to preserve the issue for appeal. Appellants were given an

31.

opportunity to object and to hold a "backup hearing" if needed but did not do so. (*People v. Anderson* (2010) 50 Cal.4th 19, 26, fn. 6 ["Defendant ... waived a claim of error as to the amount of restitution by failing to object on that ground in the trial court"]; *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 ["[B]y his failure to object, defendant forfeited any claim that the order was merely unwarranted by the evidence, as distinct from being unauthorized by statute"].) Since appellants did not object in the trial court on this ground, they forfeited consideration of the issue on appeal.

*TAYLOR*

8. *Did the trial court err in denying Taylor's motion to sever his trial from that of his codefendants?*

Taylor contends the trial court erred in denying his motion to sever his trial from that of codefendants Carpenter and Johnson, resulting in "gross unfairness." His argument is based on a violation of *Aranda-Bruton.*[9] He argues further that he was denied effective assistance of counsel for counsel's failure to argue the severance motion on grounds that his defense was antagonistic and conflicting with that of his codefendants. We find no error.

*Background*

Prior to trial, Taylor filed a motion to sever his trial from the trial of codefendants Carpenter and Johnson. The motion was based on *Aranda-Bruton* grounds and on grounds that the pretrial statements of both Carpenter and Johnson acknowledged culpability, in part, but shifted blame to Taylor, which would result in a denial of due process.

The People filed an opposition to the motion, arguing Penal Code section 1098 provided a basis for joinder; statements of Carpenter could be sufficiently redacted to

---

[9]     *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

remove reference to Taylor; and statements of Johnson made during her second interview which implicate Taylor would not be used in the People's case-in-chief.

At a hearing on the motion, trial counsel argued that Johnson made inconsistent statements during the two interviews, denying any knowledge of fraud in the first interview and accepting some responsibility in the second, but shifting the blame entirely to Taylor. Counsel argued that Carpenter's statements incriminated Taylor and could not be redacted to prevent incriminating Taylor, due to Taylor's position in the company as the executive officer. These statements by Carpenter and Johnson were inconsistent with Taylor's defense, and his statements to Agent Fong, in which he denied any knowledge of fraud and that he relied on company employees to accurately document and bill for services rendered.

The People argued that the statements of Carpenter and Johnson could be sufficiently redacted to remove reference to Taylor. The People agreed not to use statements made by Johnson during her second interview in its case-in-chief.

The parties and the trial court went line by line through the transcripts of the interviews and redacted portions of Carpenter's statements and Johnson's statements made during her first interview. As to concerns about statements from Johnson's second interview, the prosecutor made assurances that he would not, in his case-in-chief, introduce statements made during her second interview with Agent Fong. The trial court then denied Taylor's motion to sever, stating it would "allow the redacted use of statements as a remedy."

At trial, Carpenter's redacted interview with Agents Fong and Phelan were heard and read by the jury. After the presentation of evidence, the trial court instructed the jury, inter alia, that it could consider evidence of Carpenter's statements made before trial "only against him, not against any other Defendant."

*Aranda-Bruton Applicable Law and Analysis*

Taylor's severance motion was based on the principles enunciated in *Aranda* and *Bruton.* In *Aranda, supra,* 63 Cal.2d at pages 530-531, our Supreme Court decided that

> "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible."

In *Bruton, supra,* 391 U.S. at pages 135-137, the United States Supreme Court held that the admission of one codefendant's statement that is "powerfully incriminating" of the codefendant violates the right of confrontation despite a jury instruction to consider the statement only against the declarant. There is too great a risk that the jury will not follow such a cautionary instruction. Sufficiency of the redaction is determined on a case-by-case basis in light of the statement as a whole and other evidence presented at trial. (*People v. Fletcher* (1996) 13 Cal.4th 451, 468.)

In Carpenter's redacted interview, he admitted he knew of false and fraudulent billings but mitigated his responsibility for the fraud by faulting himself for not exercising greater oversight. However, Carpenter denied repeated accusations by Agent Fong that Taylor directed the fraudulent operation. While admitting he and Taylor were co-owners, Carpenter, in his statements to Agents Fong and Phelan, never incriminated Taylor in the fraud.

34.

We find no *Aranda/Bruton* error in the trial court's denial of Taylor's severance motion.

*Ineffective Assistance of Counsel*

Taylor makes the additional argument that he was denied effective assistance of counsel because counsel failed to argue antagonistic defenses as a basis for the severance motion. He contends further that counsel was ineffective for failing, following the verdict, to move for reversal of his convictions because consolidation resulted in gross unfairness and a denial of due process.

In assessing claims of ineffective assistance of counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability sufficient to undermine confidence in the outcome of the case. (*People v. Gray, supra,* 37 Cal.4th at pp. 206–207.) It is Taylor's burden to establish constitutionally inadequate assistance of counsel. (*Id.* at p. 207.) He has not done so here.

Penal Code section 1098 provides in relevant part, "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." "Section 1098 establishes a clear legislative preference for joint trials where ... multiple defendants are charged with the same crimes against the same victims." (*People v. Gamache* (2010) 48 Cal.4th 347, 381.)

Separate trials may be appropriate "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People v. Massie* (1967) 66 Cal.2d 899, 917, fns. omitted.)

35.

Taylor argues trial counsel was ineffective for failing to argue that trial severance was warranted because "both Carpenter and Johnson shifted the blame to [Taylor] for the fraud," creating antagonistic and conflicting defenses. However, neither Carpenter nor Johnson, in the evidence presented to the jury, directly blamed Taylor for the nonprofit's false billings or accused him of fraud.

Moreover, mutually antagonistic defenses are not per se prejudicial. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819.) On the contrary, severance is required for antagonistic defenses only when " ' "the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41, original italics.) "If the moving party's guilt can be established by sufficient independent evidence, 'it is not the conflict alone that demonstrates ... guilt,' and severance is not required." (*People v. Winbush* (2017) 2 Cal.5th 402, 456, quoting *People v. Coffman and Marlow*, *supra*, at p. 41.)

A trial court's denial of a severance motion is reviewed under the abuse of discretion standard, based on the facts at the time of the trial court's ruling. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 41.) However, "[w]e have held that even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 851.) We therefore address the contention that the joint trial ultimately resulted in a denial of due process.

"[Defendant] bear[s] the burden of establishing that the trial was grossly unfair and denied [him] due process of law, and 'a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt." ' " (*People v. Daveggio and Michaud, supra*, 4 Cal.5th at p. 821.)

Here no severance was required. The independent evidence against Taylor was overwhelming. It was Taylor who sought out and developed a business model to receive government funding as the revenue source. Taylor then submitted applications with the appropriate agencies to have the nonprofit certified to participate in the DMC program and then receive a contract with the county as a DMC provider. Former employees testified at trial that Taylor personally obtained, or directed others to obtain, personal identifying information of Medi-Cal eligible individuals, and to enroll those individuals in the nonprofit, regardless of a need for substance abuse counseling. Taylor directed or threatened employees to fraudulently increase the billings and to complete false documents to support the billings. Employees also testified that Taylor incentivized the fraud by giving bonuses.

Antagonistic and conflicting defenses were not grounds that would have compelled trial severance here and Taylor's trial counsel cannot be ineffective for failing to make such a frivolous motion. (*People v. Thompson, supra,* 49 Cal.4th at p. 122.) Furthermore, Taylor has failed to establish gross unfairness resulting in a denial of his due process. The evidence actually adduced at trial does not undermine the trial court's pretrial ruling. We therefore reject Taylor's trial severance claim.

## *JOHNSON*

9. *Did Johnson's conviction violate the due process clause because the evidence of guilt came solely from uncorroborated accomplice testimony?*

Johnson contends there was insufficient evidence to support her conviction for grand theft because the evidence of guilt came solely from the uncorroborated evidence of accomplice testimony. We disagree.

### *Applicable Law and Analysis*

Again, in reviewing the sufficiency of the evidence to support a defendant's conviction, "we examine 'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is

37.

reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier of fact reasonably could deduce from the evidence. [Citation.] The jury, not the appellate court, must be convinced of guilt beyond a reasonable doubt; for us, '[t]he test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt.' [Citation.]" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024.)

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) The testimony of an accomplice must be corroborated by "such other evidence as shall tend to connect the defendant with the commission of the offense." (*Ibid.*) Such evidence may not come from or require " 'aid or assistance from the testimony of' " other accomplices or the accomplice himself. (*People v. Davis* (2005) 36 Cal.4th 510, 543.)

Under Penal Code section 1111, the jury had to conclude independent evidence linked Johnson to the crimes before relying on the accomplices' trial testimony. (See *People v. Vu, supra,* 143 Cal.App.4th at pp. 1021–1022.) "The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, so long as it tends to implicate the defendant by relating to an act that is an element of the crime. [Citations.] The independent evidence need not corroborate the accomplice as to every fact on which the accomplice testifies [citation] and need not establish every element of the charged offense [citation]. The corroborating evidence is sufficient if, without aid from accomplice testimony, it ' " 'tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth.' " ' [Citations.]" (*Id.* at p. 1022.)

The trial court instructed with CALCRIM No. 335 that Hernandez, Castillo, Gonzales, Brownell, and Walker were accomplices as a matter of law.[10] That instruction provided, in relevant part, that the defendant may not be convicted of any crime "based on the statement or testimony of an accomplice alone" but only if "[t]he accomplice's statement or testimony is supported by other evidence that you believe" independent of the accomplice's statement or testimony, and the supporting evidence "tends to connect the defendant to the commission of the crimes." The instruction provides that the supporting evidence:

> "may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime."

The jury's "determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence … does not reasonably tend to connect the defendant with the commission of the crime." (*People v. Williams* (2013) 56 Cal.4th 630, 678–679.)

Johnson was found guilty of grand theft by false pretense. We earlier found sufficient evidence established the corpus delicti for grand theft by pretense as to Carpenter. (See, issue 4, above.) The question, therefore, is whether there is sufficient corroborating evidence to connect Johnson with grand theft by false pretense, not just connect Johnson with the nonprofit.

We find the evidence here sufficient to connect Johnson with the grand theft by false pretense. Johnson was the biller for the nonprofit, entering the false information

---

[10] All five witnesses testified under immunity that they knowingly submitted fraudulent paperwork for the nonprofit's billing department.

into the SAIS. She was hired in the spring of 2012 and quickly moved from counselor to site coordinator for both Boys and Girls Clubs, and then to program director/biller. She received greater monetary compensation for her role as biller, which was acknowledged by Johnson, who told Agent Fong that she received a Christmas bonus from Taylor. This was borne out by Johnson's bank account record, which showed cash deposits totaling $10,414.67 between August 14, 2012 and May 15, 2013. Despite receiving regular payroll checks from the nonprofit, the source of the cash could not be accurately determined. "The corroboration may be found in the statements and admissions of the defendant himself, either standing alone or coupled with other evidence." (*People v. Traub* (1959) 175 Cal.App.2d 709, 712.)

In addition, Daylon P., a former student whose identity and Medi-Cal eligibility the nonprofit exploited, testified that he never attended a counseling session with the nonprofit. On cross-examination, when asked if he recalled a counseling session with Johnson, Daylon replied that he did not. When shown a progress note documenting the session, he still did not recall having attended such a session with Johnson. Johnson testified, denying that she ever wrote a progress note for sessions she did not give and insisted that she recognized Daylon from such sessions. "When … it is discovered that there is testimony aside from that of the accomplice which tends to connect the defendant with the commission of the crime, the function of the appellate court is performed. Questions of the weight of the evidence and the credibility of the witnesses are for the [trier of fact]." (*People v. Morris* (1953) 115 Cal.App.2d 312, 316.)

We reject Johnson's claim of insufficient corroboration of accomplice testimony.

10. *Was counsel ineffective for failing to move to redact Carpenter's statement implicating Johnson?*

Lastly, Johnson argues that trial counsel was ineffective for failing to move, under *Bruton* and *Aranda* to redact Carpenter's statements implicating her.

40.

Johnson cites to three passages in Carpenter's interview with Agent Fong she contends should have been redacted under *Aranda/Bruton*.

In the first instance, when Carpenter was asked whether he falsely put a student's name on the roster who had not attended counseling, Carpenter stated that this would have been done "[p]robably" by the "individuals who were billing," naming Johnson, who had been billing since December 2012, and her predecessor, Gonzales. He insisted that he wasn't saying that Johnson had falsified the billing records, but that there was a "possibility" she had done so as she had learned how to bill from Gonzales.

In the second instance, Carpenter stated that he thought it would be the counselors who falsified the records but repeated that it could "[p]ossibly" be the biller who did so, but he did not know.

And in the third instance, the back and forth between Carpenter and Agent Fong is somewhat confusing but, assuming they are talking about Johnson, Agent Fong asked, "Did she feel bad about having to do that?" Carpenter replied, "Yeah she didn't want, she didn't want to do it. I told her not…" When Agent Fong asked, "cause it's against the law …?" Carpenter replied, I told her not, not to do that" and acknowledged it was against the law.

### *Applicable Law and Analysis*

Johnson contends the statements made by codefendant Carpenter violated her constitutional right of confrontation under the *Aranda/Bruton* rule. We disagree. We conclude that Johnson forfeited this claim by failing to object in the trial court and further conclude that, on the merits, any error was harmless beyond a reasonable doubt. For this reason, we reject her claim of ineffective assistance of counsel for failing to object to the statements as well.

Admission of an out-of-court statement by a non-testifying defendant incriminating a codefendant violates the codefendant's rights of confrontation and cross-examination. (*Aranda, supra,* 63 Cal.2d at pp. 528–531; *Bruton, supra,* 391 U.S. at pp.

135–137.)  Such a statement is admissible if redacted so that it is not incriminating "on its face."  (*Richardson v. Marsh* (1987) 481 U.S. 200, 208.)  Johnson's counsel participated at length in determining which statements were to be redacted but did not object to the statement as adopted by the trial court and parties.  The failure of Johnson to object forfeited her *Aranda/Bruton* claim.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 186 [failure to object on confrontation clause grounds waives claim].)

Regardless of whether the objection was forfeited, we address Johnson's further claim that counsel's failure to object constituted ineffective assistance of counsel.  We disagree.

As earlier addressed, to establish ineffective assistance, a defendant must show counsel's conduct was both deficient and resulted in prejudice.  (*Strickland v. Washington, supra,* 466 U.S. at pp. 687–688; *People v. Mayfield* (1997) 14 Cal.4th 668, 783–784.)  Tactical choices made after investigation of the law and facts are "virtually unchallengeable" on appeal.  (See *In re Cudjo* (1999) 20 Cal.4th 673, 692.)

Carpenter's statements to Agents Fong and Phelan identified Johnson as a biller, but did not directly and powerfully incriminate her, as expressed in *Aranda/Bruton*.  (*People v. Fletcher, supra,* 13 Cal.4th at p. 455.)  In fact, defense counsel may have reasonably concluded that the redactions in the statements were sufficient as agreed upon and, perhaps, even advantageous to Johnson.  One of the questions by Agent Phelan specifically asked if Johnson would have an incentive to add extra billing, to which Carpenter stated that Johnson did not, as she was paid hourly and did not get a bonus.

In addition, despite Carpenter's claims of not knowing and poor oversight, he placed the blame for the fraud primarily on Gonzales, Castillo, and Hernandez, stating the three employees "came from other locations" and he, wanting to learn from them, "followed their direction even being the Director."  When asked specifically by Agent Fong if he was blaming Gonzales, Castillo and Hernandez, Carpenter stated that, when the three employees arrived, the revenues generated a "sudden … spike."

The record also shows that, prior to trial, during Taylor's severance motion (see issue 8, above), Johnson orally joined the motion, requesting an "interim remedy," a separate jury as an alternative to trial severance. In doing so, Johnson's counsel expressed the view that Carpenter made statements to Agents Fong and Phelan that were "very useful for [his]client [Johnson]."

In any event, even if ineffective assistance of counsel occurred, Johnson cannot show prejudice. The jury hung on all charges against Johnson except for the grand theft conviction. We rejected Johnson's sufficiency of the evidence challenge as to her grand theft conviction in issue 9, above, and need not do so again.

## DISPOSITION

We remand to the superior court to vacate counts 1 and 2 as to Carpenter and Taylor and to stay count 4 as to Carpenter. The superior court is directed to send a corrected abstract of judgment to the Department of Rehabilitation and Corrections. In all other respects, the judgment is affirmed.

FRANSON, ACTING P. J.

WE CONCUR:


PEÑA, J.


SNAUFFER, J.